Argued April 7, affirmed June 2, 1955

IN THE MATTER OF THE ESTATE OF EVA A. BOORD,
DECEASED
BANTA *v.* LEFFLER
284 P. 2d 348

*Karl Huston* argued the cause for appellant.

*Orval Thompson,* of Albany, argued the cause for respondent.

Before WARNER, Chief Justice, and ROSSMAN, LATOURETTE and PERRY, Justices.

PERRY, J.

This is a contest of the will of Eva A. Boord, deceased, brought by Opal Banta, as plaintiff, against Madeline Leffler, as defendant. For the purposes of this opinion, we will designate Eva A. Boord as the

testatrix, Opal Banta as the plaintiff, and Madeline Leffler as the defendant.

On September 20, 1951, Eva A. Boord, the testatrix, executed an instrument as her last will and testament, wherein she devised to Madeline Leffler, a niece of her husband, real property of the value of approximately $10,000, and devised the balance of her property "of whatever kind and wheresoever situated", which was of a relatively small value, to her daughter Opal Banta.

The evidence discloses that in 1939 the testatrix suffered a stroke which partially incapacitated her in her physical movements and affected her vocal expression. In February, 1952, she fell and fractured her hip, at which time she was removed from her home to a hospital.

The testimony concerning the circumstances surrounding the drafting and execution of the will is as follows:

The testatrix sent word, either by the plaintiff or the defendant or both, to Mr. F. E. Grant, who at the time of the execution of the will was the manager of The First Federal Savings & Loan Association at Corvallis, that she desired to see him. The testatrix was a depositor in the bank, and when she desired to deposit money, she would frequently send word to Mr. Grant for him to come to her home. Upon receiving notice of the testatrix' desire to see him, Mr. Grant went to her home, visited with her, and, after obtaining from her information as to her desires in the distribution of her property, he contacted Mr. C. M. Huddleston, an attorney in Corvallis. Mr. Huddleston prepared a will in accordance with Mr. Grant's understanding of the desires of the testatrix, and in company with Mr. Grant, Mr. Huddleston went to the home of the testatrix. Upon their arrival at the home, Mr. Hud-

dleston asked the testatrix whether or not it was her desire to have a will made and what she had in mind as to the distribution of her estate; this took place before the showing or reading of the will, which he had already prepared at his office, to the testatrix. Mr. Huddleston testified that the testatrix said she wanted her daughter (the plaintiff) to have her personal property, and she wanted to give the real property to her niece (the defendant); that she referred to her real property as "being one lot and a half and an additional ten feet", and when he asked her what personal property she owned, she replied she had "a savings account in the First Federal Savings & Loan Association and her household goods"; he also queried her as to her children and grandchildren; she was also asked as to whom she had in mind to act as an executrix, and she stated that she wanted Madeline Leffler (the defendant), and that she wanted her to serve without bond. Mr. Huddleston further testified to the effect that after he had received this information, which was identical with the provisions of the unexecuted will, he offered her the will to read, but she requested that he read it to her, which he did; that after hearing the proposed will read, she said that was what she wanted. The testatrix then executed the will in the presence of Mr. Huddleston and Mr. Grant, and they acknowledged the will in her presence and in the presence of each other. It is further disclosed by the testimony that only Mr. Grant, Mr. Huddleston, and the testatrix were present at the time the will was executed, but the plaintiff was in the "back part of the house and out on the back porch". After the will was executed, the testatrix requested Mr. Grant to take care of it. Mr. Grant and Mr. Huddleston testified to these same circumstances.

The defendant also presented lay witnesses who

testified generally to facts pertinent to the competency of the testatrix to execute her will.

The plaintiff then offered evidence from which it may be gathered that, subsequent to the stroke suffered in 1939 by the testatrix, she suffered a change of personality to such an extent that she would call her daughter "son", "Ed", "boy", or some other masculine designation, and she would call her husband "mother", "old woman", "girl", or some other feminine designation; that generally she referred to little boys as little girls, and vice versa; that one had to be well-acquainted with her to understand what thought she intended to convey by her speech, and that it was almost impossible to carry on a normal conversation with her; that she did not keep herself physically clean as she had before this difficulty. There is testimony that after the testatrix suffered the stroke she used vile and indecent language toward her granddaughter, although she had previously been a religious woman, and after this event she particularly disliked ministers or clergymen because of their connection with religion; she became very miserly and had an unreasonable fear of going hungry. There was evidence from which an inference might be drawn that, while she looked after her business, it was not always judiciously transacted by her, and on occasions the business transacted was at the suggestion of others.

The plaintiff called as witnesses two duly licensed physicians, Dr. Alice M. Bahrs and Dr. Harry Anderson. Dr. Bahrs testified she saw the testatrix for the first time at the time her hip was broken, some six months after the execution of the will, and she further testified that in her opinion the testatrix was suffering from cerebro-arteriosclerosis, which results in senility, and that the testatrix had been insane for at least a

year prior to the time she had become a patient of this doctor. Dr. Anderson, who had known the testatrix over a period of five or six years, stated as his opinion that the testatrix was very peculiar in her reactions, and her general mentality was in many respects that of a youngster; that in his opinion she was not competent to take care of normal business transactions.

The trial court determined from all of the evidence that the testatrix was competent, at the time of its execution, to make a last will and testament, and admitted the will to probate. From this finding the plaintiff has appealed.

■■ While there is a conflict in the testimony, the direct testimony of the subscribing witnesses to the will, who have no interest in the result of this litigation, and who had the opportunity of questioning the testatrix and observing her ability to understand the nature of the transaction at the very time it was being carried on, and to observe her ability to express her desires as to the disposal of her property, is very persuasive. *McCracken v. McCracken et al.*, 109 Or 83, 219 P 196; *Heirs of Clark v. T. A. and J. D. Ellis*, 9 Or 128. This, together with our examination of all of the evidence, impels us to conclude that the defendant met the burden of proof necessary to establish the testamentary competency of the testatrix to execute her will.

The plaintiff assigns as error a ruling of the trial court which permitted certain lay witnesses—some of whom were attesting witnesses to the will, and others who were acquainted with the testatrix—to give opinion testimony relative to the testamentary capacity of the testatrix. The plaintiff's objection to the questions is that they were designed to elicit the opinion of the witness relative to the capacity of the testatrix to recognize the judicial standards of testamentary capacity, so were improper as invading the province of the

trier of fact. An example of the interrogatory is as follows:

> "Q What would you say then of her mental capacity to know and appreciate * * * those dependent upon her bounty?"

No complaint is made in this case as to whether or not a sufficient foundation was laid from which the witness could express an opinion.

■ ORS 41.900 provides:

> "Evidence may be given of the following facts:
>
> "* * * * *
>
> "(10) The opinion of a subscribing witness to a writing, the validity of which is in dispute, respecting the mental sanity of the signer; and the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given."

Reason dictates that this statute, insofar as applicable to will contests, contemplates an opinion of a qualified witness upon the mental capacity of a person to execute that particular instrument.

■ We have stated many times, but we will again reiterate it; the test of "mental sanity" required of one executing a valid will is, (1) the testator at the time of making his will must comprehend the nature of the act in which he is engaged, (2) he must know the nature and extent of the property to be disposed of, (3) he must have in mind the persons who are or should be the objects of and entitled to his bounty, and (4) he must understand the import of the provisions made for the distribution of his estate in the written instrument. *Re Phillips' Will*, 107 Or 612, 213 P 627.

■ An inquiry into the mental sanity of a testator, therefore, is directed to a determination of his sane comprehension of each of the necessary elements set

out, which, when answered in the affirmative, meet the requirements of testamentary capacity.

■ We have on numerous occasions stated, and correctly so, that it is improper for a witness to give his opinion "that the testator had capacity to make a will, * * *, for that is the identical problem before the court". *Estate of Allen,* 116 Or 467, 491, 241 P 996; *McCracken v. McCracken et al.,* supra; *In re Sturtevant's Estate,* 92 Or 269, 283, 178 P 192. In condemning this practice, we have stated that the vice of permitting this conclusion of the witness to be given is because it invades the province of the trier of fact, but an even greater vice, we think, is that it assumes a witness is fully conversant with the requisite mental capacity necessary to make a will; thus there is presented to the witness a question of law as well as a question of fact, and the unknowing witness is left to fix his own standard of mental capacity to make a will.

■ The type of interrogation here under consideration, however, is not objectionable upon either of the above grounds, for, while each question elicits an answer that goes to a necessary element included in the ultimate question to be decided by the trier of fact, it does not fully answer the question to be decided, nor does it assume that the witness knows the mental sanity requisite for a testator to meet the requirements of testamentary capacity.

■ While there is a diversity of judicial opinion as to whether a qualified witness may properly be asked to express an opinion upon the testator's capacity to comprehend the "recognized judicial or statutory standards of testamentary capacity" (155 ALR 288), we are of the opinion that the better rule is to permit a qualified witness to express his opinion upon each of the elements required for mental sanity to constitute testamentary capacity.

It would be absurd to a point of ultraism to permit a witness to pass judgment on the "mental sanity" of a testator, yet deny him the privilege of giving his opinion as to the ability of the same testator to understand and comprehend the nature of the act in which the testator was engaged, the nature and extent of the testator's property, to recognize those persons who are the objects of and entitled to his bounty, and the testator's understanding of the import of the provisions for the distribution of his estate. In cases such as this, we agree with the Minnesota court in *In Re Olson,* 176 Minn 360, 370, 223 NW 677, where the court was considering an interrogatory addressed to a qualified witness as to whether or not the testator had sufficient mental capacity, and the court there stated:

"* * * That is a matter well left to the discretion of the trial judge. While in a will contest the opinion of a witness, lay or scientific, should not be asked as to the testator's capacity to make a valid will, there is certainly no objection to questions concerning his ability to comprehend his property and dispose of it understandingly."

We are of the opinion that the trial court did not err in this regard.

The decree of the trial court is affirmed.

Neither party shall recover costs in this court.